**WESTERN NEW YORK WATER COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**UTILITIES & INDUSTRIES CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 385, 386, Dockets 29418, 29419.**

United States Court of Appeals Second Circuit.

Argued May 18, 1965.

Decided July 26, 1965.

---

Robert J. Casey, New York City (Thomas E. Tyre, and Clark, Carr & Ellis, New York City, on the brief), for petitioners.

William A. Friedlander, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before WATERMAN, MARSHALL and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Western New York Water Company, the taxpayer,[1] was incorporated under the laws of the State of New York in 1902 for the purpose of selling water in Erie County. In July of that year it purchased all of the outstanding stock of the Depew & Lake Erie Water Company. In 1909 Depew was liquidated and all of its properties were transferred to Western.

In 1900 Depew entered into an agreement with the New York Central Railroad under the terms of which it was to supply water to the Railroad at a favorable rate in exchange for rights of way necessary for its pipeline system. Between 1902 and 1909 Western and Depew engaged in extensive construction of facilities, in excess of current demand, to increase their capacity to furnish water to customers. By March 1, 1913 the taxpayer had an established, operating water supply system, consisting of principal trunk lines laid in railroad rights of way, reservoirs, pumping stations, transmission mains to various communities, distribution mains and service pipes to customers.

The purpose in constructing the trunk lines and transmission mains for a larger water-carrying capacity than was actually required at the times they were laid, was to provide for future growth

1. Western New York Water Company was dissolved in 1956. Upon dissolution most of its assets were transferred to the New York Water Service Corporation, whose name was subsequently changed to Utili- ties & Industries Corporation. Although Western is the taxpayer involved herein, Utilities & Industries Corporation, its successor in interest, is liable, as transferee, for any deficiencies.

of the system without the added expense of laying new pipe from time to time as the increased demand might arise. Because of this added investment in what was then excess capacity and also, as Western claims, because of the low rates paid by the Railroad, the principal customer during that period, the two companies' combined statement of net earnings and losses for the period of 1900 to 1913 showed losses in the aggregate amount of $213,431.14.[2] The record does not disclose when, if ever, after March 1, 1913, the taxpayer's operations became profitable and does not reflect net earnings and losses for such years. Nor was there any evidence whatever on which a valuation expert could, as of March 1, 1913, have reasonably based a prognosis of any future increase in the demand for water.

In 1951 the Erie County Water Authority commenced condemnation proceedings against the taxpayer for the acquisition of all of the taxpayer's property. In 1953 a settlement in lieu of condemnation was reached. Under the terms of the involuntary sale which followed, the taxpayer's assets and properties were turned over to the Authority for a total consideration of $14,780,022.-11. For Federal income tax purposes, Western reported a gain on the sale of $653,755.63. In computing the gain, Western deducted from the proceeds of the sale the sum of $14,126,266.48, as its cost basis, which included the following items and amounts, carried on its books as non-depreciable capital assets:

a) easements ............$5,221,150.00
b) interest during con-
   struction .............   316,521.69
c) bond discount and is-
   sue cost ..............   272,771.15
d) engineering and super-
   intendence ..........    12,035.54
e) miscellaneous construction
   cost .................     9,006.52

On Western's tax return, no amount was included in this cost basis for going concern value.

In the statutory notice of deficiency the Commissioner adjusted the basis by disallowing the above items. The taxpayer petitioned the Tax Court for a redetermination of its deficiency for 1953. The Commissioner then conceded that items (b)–(e), supra, were includable in the adjusted basis, but the Tax Court, on the strength of competent testimony, determined that the easements had a fair market value on March 1, 1913 of only $3,500,000, which is the amount it held to be includable with items (b), (c), (d),

2.

|  | *Depew* |  |  |
|---|---|---|---|
| May 10, 1900–December 31, | 1901 | ........................ | ($ 0,940.04) |
|  | 1902 | ........................ | ( 13,340.61) |
|  | 1903 | ........................ | ( 21,021.95) |
|  | 1904 | ........................ | ( 1,569.27) |
|  | 1905 | ........................ | 3,644.34 |
|  | 1906 | ........................ | 31.10 |
|  | 1907 | ........................ | 7,159.55 |
|  | 1908 | ........................ | 17,555.46 |
| January 1, 1909–July 31, | 1909 | ........................ | 23,208.44 |
|  | *Western* |  |  |
| July 24, 1902–December 31, | 1904 | ........................ | ($ 1,270.09) |
|  | 1905 | ........................ | ( 2,133.14) |
|  | 1906 | ........................ | ( 2,635.91) |
|  | 1907 | ........................ | ( 3,033.81) |
|  | 1908 | ........................ | ( 2,605.57) |
|  | 1909 | ........................ | ( 75,444.44) |
|  | 1910 | ........................ | ( 8,459.58) |
|  | 1911 | ........................ | ( 28,294.97) |
|  | 1912 | ........................ | ( 85,834.29) |
| January 1, 1913–February 28, | 1913 | ........................ | ( 18,446.36) |

and (e). It sustained, for lack of adequate proof, the Commissioner's disallowance of $1,075,948 for "going concern value" as of March 1, 1913, which the taxpayer had claimed for the first time in the Tax Court proceedings as an addition to its cost basis. It is from this ruling on the claimed "going concern value" that Western appeals.

For a company of this kind "going concern value" is defined as that "amount by which the value of a utility plant in operation, with customers and an established revenue, exceeds the value of an exactly similar plant all ready to go, or going, without any customers or revenue, but so situated that the acquisition of customers and revenue is a mere matter of time and ordinary adjustments." II Whitten & Wilcox, Valuation of Public Service Corporations, § 470 at 1347 (2d ed. 1928); Omaha v. Omaha Water Co., 218 U.S. 180, 30 S.Ct. 615, 54 L.Ed. 991 (1910); National Waterworks Co. v. Kansas City, 62 F. 853 (8th Cir. 1894).

■ The burden of proof was on the taxpayer to show that there was some going concern value as of March 1, 1913, 3A Mertens, Federal Income Taxation § 21.10 at 31, and that the Commissioner's action, therefore, in disallowing this intangible item was arbitrary and wrong. It was not necessary for the taxpayer to show, in dollars, the exact amount of going concern value for the purpose of proving that the Commissioner was arbitrary in not considering going concern value at all. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962); Campbell County State Bank Inc. of Herreid v. C. I. R., 311 F.2d 374, 379 (8th Cir. 1963); Harp v. C. I. R., 263 F.2d 139, 141 (6th Cir. 1959).

Under § 113 of the Internal Revenue Code of 1939, 26 U.S.C. § 113 (1952), the basis for determining gain or loss on a subsequent sale of those assets acquired, in this case, prior to March 1, 1913, was the fair market value thereof as of that date, i. e., what a willing purchaser would, at that time, have paid a willing seller, neither being under any compulsion to buy or sell. Alvary v. United States, supra, 302 F.2d at 794. The petitioner, Western New York Water Company, had only to prove that there was a reasonable basis for assuming that a willing purchaser would, as of March 1, 1913, have paid something for the going concern feature of the company or, in other words, that it then had a going concern value. This the petitioner failed to do. What it offered was a formulation of figures based solely on deficits and losses, which standing by themselves are not competent to establish going concern value in a purchase case.

Western's expert testified that the water works system had a going concern value of $1,075,948. In arriving at this figure he reconstructed the 1913 value of Western's physical assets, $1,567,453, to which he applied 10%, which he considered a fair rate of annual return. He thus calculated deficiencies in return, for the period between 1900 and 1913, to which he added unearned depreciation and the amount of net losses sustained during this period of development and construction. After making certain adjustments, he arrived at the net figure which he used to measure going concern value. There was offered no evidence of net earnings or losses for the years following March 1, 1913 nor was any evidence presented to show that as of March 1, 1913 there was, reasonably foreseeable, a likelihood that there would be an increased demand for water in the area served by the petitioner.

■■ There is no single or exclusive method of determining going concern value. One method is capitalization of net income, but other methods exist, and the Supreme Court has stated that going concern value may be present even in a business losing money or just breaking even. Kimball Laundry Co. v. United States, 338 U.S. 1, 18–19, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). Thus, a prospective purchaser may enlarge his offer despite a loss pattern over a certain period, if such losses are occasioned by

expenditures which although producing no immediate return, create a situation or are made under circumstances in which it is apparent that substantial returns will in the foreseeable future, be forthcoming. Galveston Electric Co. v. City of Galveston, 258 U.S. 388, 396, 42 S.Ct. 351, 66 L.Ed. 678 (1922).

■ Petitioner contends that the losses and deficiencies it sustained reflected investment of this character, necessarily incurred in securing and providing for future patronage. The contention is not well taken. It asserts that the poor years it suffered between 1900 and 1913 resulted from overbuilding and consequent excess capacity as well as from the losing water supply contract it had with the New York Central for which, in return, it obtained certain rights of way. Thus, the investment, which resulted in early losses, is to some extent reflected in the fair market value of the physical properties and the easements which the Tax Court included in the cost basis. Looked at another way, the losses and deficiencies were the cost of producing assets, the 1913 fair market value of which has already been taken into consideration. Fatal to the contention that these losses, to the extent that they reflect investment in the system's enlarged capacity and future potential, are the measure of Western's going concern value is the absence in the record of any opinion by a qualified person that in 1913 there was a reasonable ground to believe that through population expansion or industrial growth in the area capable of being served, there would be a substantial increase, then or in the near future, in the demand for water which would have made profitable the use of the company's added potential. On the contrary, Western's net losses were increasing at the close of the period in question, and the record is silent as to when, if ever, the entire operation became profitable. Compare, McCardle v. Indianapolis Water Co., 272 U.S. 400, 414–415, 47 S.Ct. 144, 71 L.Ed. 316 (1926); Des Moines Gas Co. v. City of Des Moines, 238 U.S. 153, 164, 35 S.Ct. 811, 59 L.Ed. 1244 (1915), which,

though rate cases, mention going concern value to a purchaser under circumstances of growing demand.

■ It cannot rationally be supposed that any purchaser would include in the purchase price a premium for the company's intangible value as a going concern, measured by the accumulation of many years of deficit operation, including losses, merely because the company made investments the value of which in terms of future earning power was not demonstrated. For the purpose of a sale the factor which gives extra value to a going concern, as distinguished from one that is not going, is its demonstrable contribution to earning power. II Whitten & Wilcox, op. cit., § 472 at 1352. Going concern value is properly measured by investment which contributes to earning power. It follows that expenditures which create no such intangible worth or which serve only to make an addition to plant capacity which is not being used and which has no prospect of being used cannot serve as a measure of going concern value.

Petitioner's reliance on People ex rel. Kings County Lighting Co. v. Willcox, 210 N.Y. 479, 104 N.E. 911, 51 L.R.A., N.S., 1 (1914), a rate case, is misplaced. The court said, p. 492, 104 N.E. p. 914:

"I define 'going value' for rate purposes as involved in this case to be the amount equal to the deficiency of net earnings below a fair return on the actual investment due solely to the time and expenditures *reasonably necessary and proper to the development of the business* and property to its present stage, *and not comprised in the valuation of the physical property*." (Emphasis added.)

The Court repeatedly said,

"* * * a reasonable need for the service from the start and reasonably good management are assumed."

The issue in the case was whether the company's deficit operation and failure to pay dividends was caused by a less

than fair return due to the failure of the public service commission to consider going concern value. If this were, indeed, the case, then the customers and the public were being improperly benefited at the expense of the investors and the company was entitled to have the matter rectified. The court indicated that for the purpose of fixing rates some errors of judgment at the inception of the business may be tolerated in anticipating what is "reasonably necessary and proper to the development of the business" but the court said, pp. 491–492, 104 N.E. p. 914,

> "While, within reasonable limits, service may be provided for anticipated needs, a company should not construct a plant in a wilderness and, after a city has been built around it, expect to recoup its losses while waiting, nor should it expect to recoup losses from bad management."

Thus there are limits on the degree of over-expansion in anticipation of future demand which will justify the use of accumulated operational deficits, generated by such over-expansion, in computing going concern value for rate cases, where the purpose is to insure the company a fair return. It is limited to what is "reasonably necessary and proper to the development of the business."

In the present case the petitioner, Western, never made a showing of the need for the service which would be provided by its excess capacity or that there was any prospect that there ever would be such a need. Moreover, the issue here is fair market value as of March 1, 1913 which invokes the question of how much a willing buyer could have been induced to pay for the company.

It is hardly likely that a purchaser, interested only in current and future prospects, and less concerned than the rate-making authority with fairness to the corporation, would make good losses which show no prospect of contributing to future profits and economy of operation.

Since Western failed to establish by any proof, let alone "solid evidence," Kimball Laundry Co. v. United States, supra, 338 U.S. at 20, 69 S.Ct. 1434, that a putative purchaser would on March 1, 1913, pay an additional amount because the company was then in operation, the Tax Court properly disallowed the claim of going concern value.

Affirmed.